## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| DOMINGO MARTINEZ, | § | |
| **Plaintiff,** | § | |
| v. | § | Civil Action No. 3:20-CV-3282-BH |
| | § | |
| KILOLO KIJAKAZI, | § | |
| ACTING COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| **Defendant.** | § | Consent Case[1] |

## MEMORANDUM OPINION AND ORDER

Based on the relevant filings, evidence and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for Disability Insurance Benefits (DIB) is **REVERSED**, and the case is **REMANDED** for reconsideration.

## I.    BACKGROUND

On September 11, 2018, Domingo Martinez (Plaintiff) filed his application for DIB under Title II of the Social Security Act, alleging disability beginning April 1, 2018. (doc. 19-1 at 175.)[2] His claim was denied initially on January 24, 2019, and upon reconsideration on March 25, 2019. (*Id.* at 81-88, 91-99.) After requesting a hearing before an Administrative Law Judge (ALJ), he testified on May 15, 2020, at a hearing held by telephone due to the "extraordinary circumstance" of the coronavirus pandemic. (*Id.* at 16, 35.) On June 24, 2020, the ALJ issued a decision finding him not disabled. (*Id.* at 27.) Plaintiff timely appealed the ALJ's decision to the Appeals Council on July 8, 2020. (*Id.* at 170-72.) The Appeals Council denied his request for review on October 13, 2020, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5.) He timely

---

[1] By consent of the parties and order filed July 29, 2021 (doc. 23), this matter has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 1.)

## A.  Age, Education, and Work Experience

Plaintiff was born on August 18, 1972. (doc. 19-1 at 26, 142, 149, 173.) He had at least a high school education, could communicate in English, and had past relevant work as a flooring specialist. (*Id.* at 207, 209.)

## B.  Medical, Psychological, and Psychiatric Evidence

On December 14, 2011, Plaintiff was diagnosed with hypertensive disorder and was prescribed medication. (*Id.* at 629, 638.) On February 2, 2016, he presented to Methodist Dallas Medical Center (Methodist) for a medication refill; he denied pain and his physical examination was normal. (*Id.* at 288-90.)

On July 25, 2016, Plaintiff was admitted to Methodist for abdominal pain. (*Id.* at 300.) A computed topography (CT) scan of the abdomen revealed a normal appendix and significant stool throughout the colon. (*Id.* at 442.) He was diagnosed with "suspected" bowel obstruction, "possible" diverticulitis, hypertension, and morbid obesity. (*Id.* at 303-04.) A colonoscopy revealed a mass on his sigmoid colon. (*Id.* at 339, 351, 353, 360, 364.) His bowel movements returned, and his abdominal pain was "mild", controlled, and intermittent rather than constant. (*Id.* at 366-67, 380.) He underwent a flexible sigmoidoscopy with insertion of a colonic stent and an open sigmoidectomy. (*Id.* at 294, 417-19.) By August 6, 2016, he had "moderate" but "controlled" abdominal pain, a soft and tender abdomen, and normal cardiac, neurological, psychiatric, and musculoskeletal functioning. (*Id.* at 414-15.) He was discharged in stable condition the next day. (*Id.* at 294.) When he returned weeks later to have his surgical staples removed, he was "doing well", except for some mild wound drainage. (*Id.* at 268-69.) On August 31, 2016, he denied abdominal pain or drainage, and his wound had almost closed. (*Id.* at 273.)

On September 9, 2016, Plaintiff presented to the emergency room (ER) at Methodist with swelling, erythema, and pain in the abdomen, but no distension. (*Id.* at 459, 462.) He was assessed with "indurated erythematous nonfluctuant" in his right lower quadrant. (*Id.* at 457.) After admission, his erythema shrunk, his pain improved, and his wounds were incised by surgery without purulent drainage. (*Id.*) He had elevated blood pressure, and his anti-hypertensive medication dosage was increased. (*Id.*) He was diagnosed with abdominal wall cellulitis, abdominal pain, morbid obesity, and hypertension. (*Id.* at 462.) The next day, he reported "feel[ing] well" and improvement in pain, and he was discharged. (*Id.* at 456.)

On September 21, 2016, Plaintiff presented to Methodist Teaching Clinics and reported no drainage, "occasional" pain when he coughed, and that his wound had almost closed. (*Id.* at 280-81.) A small abdominal wall abscess was drained, the abdominal incision was "healing well", and his physical examination was normal. (*Id.* at 282.) He was discharged the same day and given a work excuse to refrain from heavy lifting, i.e., more than 15 pounds, for two weeks. (*Id.* at 283.) On December 27, 2016, Plaintiff returned for a medication refill. (*Id.* at 276.) His blood pressure was "stable", and he denied dizziness, blurry vision, or chest pain. (*Id.* at 277.) He was medication compliant, and his hypertension was "controlled". (*Id.* at 277-78.) He reported joint pain with running, and he was counseled on "non-impact" exercises. (*Id.* at 277.)

On April 26, 2017, Plaintiff presented to Methodist Golden Cross Academic Clinic (Clinic) for a medication refill and complaints of arthritis. (*Id.* at 877.) He was diagnosed with hypertension, hyperlipidemia, and obesity. (*Id.*) On September 18, 2017, Plaintiff returned for a follow-up. (*Id.* at 875.) He was diagnosed with hypertension, obesity, hyperlipidemia, sciatic leg pain, and anxiety, and scheduled for a follow-up in two months. (*Id.*)

On October 14, 2017, Plaintiff was transported via ambulance to Methodist ER for

abdominal pain. (*Id.* at 498, 859.) He reported that he "fe[lt] something tear" while bending over the night before. (*Id.* at 498.) He had tenderness in the lower right quadrant but normal bowel sounds, exhibited no distension, and denied pain in the lower extremities or back. (*Id.* at 498, 500.) A CT scan of the abdomen revealed a normal appendix and multiple anterior abdominal wall fat-containing hernias, with no evidence of strangulation or obstruction. (*Id.* at 502.) After an iohexol injection, his pain "improved." (*Id.*) He was given a surgery referral to Clinic and advised to schedule an appointment as soon as possible. (*Id.* at 503, 864.) At discharge several hours later, he was stable, alert, and oriented times four, and he "ambulated out of ER with steady gait." (*Id.* at 868.)

On December 13, 2017, Plaintiff presented to Methodist ER, complaining of rib pain. (*Id.* at 515-16.) He reported coughing with thick white sputum, and chest imaging revealed mild subsegmental atelectasis in both lung bases. (*Id.* at 516, 518-20.) He denied weakness, numbness, headaches, abdominal pain, chest pain, arthralgias, and myalgias. (*Id.* at 516-17.) He was alert and oriented times three and had normal mood, affect, and range of motion. (*Id.* at 517-18.) He was prescribed antibiotics, diagnosed with pneumonia and chest wall pain, and discharged the same day in no acute distress. (*Id.* at 518-20.)

On December 19, 2017, Plaintiff returned to Methodist ER, complaining of rib pain and cough. (*Id.* at 523.) He reported that the antibiotics were working, but he had received only three pills and they were not enough. (*Id.*) He left before he could be examined because he "c[ould] not miss work". (*Id.*) He was alert and oriented times four, had regular and unlabored breath, and "steady gait exiting ER." (*Id.*) He returned the next day with the same complaint. (*Id.* at 526.) Chest x-rays revealed no evidence of "acute or active process." (*Id.* at 528.) He was assessed with muscle strain on chest wall and discharged in stable condition. (*Id.* at 529.)

On February 13, 2018, Plaintiff visited Clinic for a medication follow-up. (*Id.* at 826.) He underwent screening for diabetes mellitus (primary) and was diagnosed with essential hypertension. (*Id.*) He was given an outpatient "health education" referral. (*Id.* at 828.)

On July 9, 2018, Plaintiff presented to Methodist ER with anxiety and chest pain, which went away when he calmed down. (*Id.* at 541, 808.) He reported poor sleep and a lot of stress due to the anniversary of the deaths of three family members. (*Id.*) He denied leg pain or swelling, as well as abdominal pain, nausea, vomiting, dysuria, hematuria, neck pain, joint pain, muscle pain, confusion, or agitation. (*Id.* at 808-09.) On July 14, 2018, Plaintiff returned, complaining of vomiting. (*Id.* at 564.) He reported "increased stress at home", anxiety, and insomnia. (*Id.*) He was in "mild distress", ambulated without assistance, and had a normal physical examination. (*Id.* at 563, 567.) He was administered ondansetron (ODT), diagnosed with anxiety and stress, and discharged hours later "feeling better". (*Id.* at 568, 570.)

On August 20, 2018, Plaintiff presented to Clinic and was diagnosed with osteoarthritis and referred to "physical therapy (active)." (*Id.* at 775.)

On August 27, 2018, Plaintiff presented to Methodist ER for sharp and constant chest pain at a 5/10 level. (*Id.* at 595.) He had no difficulty breathing, denied pain in his chest, abdomen, back, and head, and had no acute unilateral edema or decreased range of motion, but he was anxious and in mild distress. (*Id.* at 596-97.) He was administered a ketorolac injection, diagnosed with chest wall pain, and discharged four hours later in stable condition. (*Id.* at 595, 600.)

On September 21, 2018, Plaintiff returned to Methodist ER for worsening abdominal pain. (*Id.* at 752.) His blood pressure was 158/94, he had "minor difficulty" ambulating, and he denied nausea, vomiting, or diarrhea. (*Id.*) He had breathing difficulty, normal bowel sounds, and regular heart rhythm and rate. (*Id.* at 750.) He was administered a dicyclomine injection and tablet. (*Id.* at

753.) On re-examination, there was no tenderness or guarding[3], and he was "feeling better" and wanted "to go home". (*Id.* at 751.) Upon discharge less than three hours after admission, he was alert and oriented times four, had even and unlabored respirations, and was ambulatory without assistance. (*Id.* at 752.)

On December 5, 2018, Plaintiff reported on his function report that his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, follow instructions, and use his hands. (*Id.* at 228). He wore reading glasses and used a cane; neither was prescribed by a doctor. (*Id.* at 229.)

On December 13, 2018, Plaintiff presented to Parkland Health & Hospital System (Parkland) for hypertension and blurry vision in his left eye that was getting better. (*Id.* at 641-42.) He reported stress and anxiety due to losing his job but denied chest pain. (*Id.* at 642.) Plaintiff displayed normal respiratory, cardiovascular, gastrointestinal, musculoskeletal, and neurological functioning. (*Id.*) He complained of "[j]oints arthritis" and was positive for joint pain. (*Id.*) He was assessed with arthralgia and psychosocial distress, referred to Behavioral Health, and advised to take his medication and plan a low sugar diet and regular exercise. (*Id.* at 642-43.)

In a telephone call with Parkland Behavioral Health on December 17, 2018, Plaintiff reported that he had arthritis and his "heart" left him feeling "fatigued". (*Id.* at 640.) He also stated that his anxiety symptoms were "not as bad as they used to be." (*Id.*)

On December 28, 2018, Plaintiff presented to Methodist ER with left arm swelling. (*Id.* at 730.) He had tenderness to palpation on his left mid forearm but normal neck inspection and 5/5 strength in all extremities. (*Id.* at 731.) He was given ibuprofen, diagnosed with cellulitis of left

---

[3] Guarding is "[a] spasm of muscles to minimize motion or agitation of sites affected by injury or disease." *Guarding*, Stedmans Medical Dictionary (2014).

6

upper extremity, prescribed antibiotics, and discharged about three hours later in "stable" condition and in no apparent distress. (*Id.* at 732.) On December 30, 2018, Plaintiff returned for left forearm swelling and redness. (*Id.* at 721.) His pain was constant, throbbing, worse with touch, and had prevented him from sleeping the night before; he denied drainage. (*Id.*) He had normal cardiovascular, respiratory, musculoskeletal, and neurological functioning. (*Id.* at 723.)

On January 2, 2019, Plaintiff submitted to a psychological consultative examination by Michael P. Dolan, Ph.D. (Examiner). (*Id.* at 631.) Plaintiff reported that his psychological symptoms had increased over the previous year. (*Id.* at 632.) His mood was anxious and labile, and he had fair judgment, average intelligence and fund of knowledge, and intact short-term memory. (*Id.* at 632-33.) He was able to concentrate to do simple abstract reasoning tasks. (*Id.* at 633.) He was respectful, polite, and cooperative. (*Id.* at 631-32.) Plaintiff was diagnosed with generalized anxiety disorder and unspecified depressive disorder, with anxious distress (provisional). (*Id.* at 634.) Examiner's 4-page report was not accompanied by any supporting examinations. (*Id.* at 631-34.)

On January 11, 2019, state agency medical consultant (SAMC) James Wright, M.D., completed a medical evaluation based on a review of Plaintiff's record. (*Id.* at 84-85.) He noted that Plaintiff alleged the impairments of osteoarthritis, hernias, anxiety, and necrophobia, but his hernia had been treated in 2016 and was non-severe at that point, and there were no treatments on file for chronic arthritis or joint-related issues. (*Id.* at 82, 85.) The physical examination on file showed normal gait, normal range of motion of joints, and no complaints of arthritic issues when he went to Methodist. (*Id.*) Plaintiff's activities of daily living also did not suggest significant limitations due to physical issues. (*Id.*) He concluded that Plaintiff's alleged limitations were partially support by the evidence of record, and his allegations were partially consistent. (*Id.*)

7

On January 21, 2019, state agency psychological consultant (SAPC) Margaret Meyer, M.D., completed a psychiatric review technique based on a review of Plaintiff's record. (*Id.* at 85-86.) She considered his reported anxiety and coping issues, his August 2018 ER visit for an anxiety attack, and that he appeared anxious and labile (but had a normal mental status examination) and was diagnosed with generalized anxiety disorder and depressive disorder in January 2019. (*Id.* at 86.) SAPC Meyer opined that Plaintiff's non-severe impairment of "anxiety and obsessive-compulsive disorders" did not satisfy the paragraph A criteria of Listings 12.04 (depressive, bipolar, and related disorders) or 12.06 (anxiety and obsessive-compulsive disorders). (*Id.* at 85.) She also determined that he had no limitations in the paragraph B mental functions, consisting of ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; or adapt or manage oneself. (*Id.* at 85-86.) Finally, she determined that the evidence did not establish the presence of paragraph C criteria. (*Id.* at 86.) She determined that his limitations were "partially supported" by the evidence of record and his allegations were "partially consistent". (*Id.* at 85-87.) She noted that no mental residual functional capacity (RFC) was completed and there was "no indication" of a medical opinion from any medical source in the Plaintiff's record; she opined that a consultative examination was "required" because the medical and non-medical evidence as a whole was "not sufficient" to support a decision on the claim. (*Id.* at 84, 87.)

On March 14, 2019, SAMC Kim Rowlands, M.D., completed a medical evaluation based on Plaintiff's records. (*Id.* at 95-96.) She noted that he had not alleged any worsening or new conditions, and that new medical evidence had been ordered and obtained, but there had been "no significant changes" to the medical evidence since the initial decision. (*Id.* at 96.) She concluded that the evidence continued to support the initial determination that Plaintiff's hernia was non-

severe. (*Id.*)

On March 24, 2019, SAPC Jean Germain, Ph.D., completed a psychiatric review technique based on a review of Plaintiff's record. (*Id.* at 96-97.) She noted his allegations of anxiety and necrophilia, his August 2018 ER visit for an anxiety attack, and his normal mental status examination and diagnoses of generalized anxiety disorder and depressive disorder in January 2019. (*Id.* at 97.) She also noted that Plaintiff had not alleged any new worsening or new conditions, and there had been "no significant changes" to the medical evidence since the initial determination, despite obtaining new medical evidence of record. (*Id.*) She concurred with the findings of SAPC Meyer's psychiatric review technique, except she found that Plaintiff had a "mild" limitation (instead of no limitation) in each of the paragraph B mental functions. (*Id.*) SAPC Germain determined that Plaintiff's limitations were "partially supported" by the evidence of record and his allegations were "partially consistent"; she concluded that a review of the evidence at reconsideration supported limitations given at the initial level review. (*Id.* at 97-98.) She noted that no mental RFC was completed and there was still no indication of a medical opinion from any medical source in the Plaintiff's record; she opined that a consultative examination was still "required" because the medical and non-medical evidence as a whole was insufficient to support a decision on the claim. (*Id.* at 95, 99.)

On March 28, 2019, Plaintiff presented to Methodist ED complaining of sharp and constant pain in his right lower back that had begun a day earlier. (*Id.* at 708.) He weighed 296 pounds and was 5 feet and 7 inches tall. (*Id.* at 709.) He denied cardiovascular or gastrointestinal pain and had normal heart sounds, breath sounds, bowel sounds, and range of motion. (*Id.* at 709-10.) He was given a ketorolac injection, diagnosed with back strain (initial encounter), discharged the same day in stable condition, and advised to follow up with his primary care physician. (*Id.* at 711-12.) He

was prescribed meloxicam, acetaminophen, and methocarbamol. (*Id.* at 712.) Imaging of the lumbar spine revealed no fractures or subluxations and normal alignment of the lumbar spine, and the vertebral body heights and disc spaces were "maintained". (*Id.* at 711, 716.) Imaging of the chest revealed no acute radiographic abnormality. (*Id.* at 711.)

On May 23, 2019, Plaintiff presented to Parkland, complaining of myalgia, body aches, joint pain, chronic nausea, and chest tightness. (*Id.* at 667.) He had normal rate, regular rhythm and heart sounds, normal breath sounds, normal bowel sounds, no edema, and normal mood and affect. (*Id.*) He was prescribed Ranitidine for nausea, counseled on diet and exercise, and advised to take medications as recommended. (*Id.* at 669.)

On August 30, 2019, Plaintiff presented to Metrocare Services (Metrocare), complaining of anxiety and depression. (*Id.* at 971.) He reported his symptoms had worsened after a family conflict three weeks earlier. (*Id.*) He appeared adequately groomed and cooperative and had intact memory and normal attention and concentration. (*Id.*)

On October 7, 2019, Plaintiff presented to Parkland for multiple joint pain, cracking sounds, cramping in legs and arms, and right finger numbness. (*Id.* at 674, 676.) His cardiovascular, pulmonary, and abdominal systems were normal, and he had no edema or tenderness. (*Id.* at 675.) He denied any cardiovascular, gastrointestinal or musculoskeletal pain, but he was positive for sensory change, although he denied any dizziness, tingling, tremors, or speech change. (*Id.*) He was using a cane, and his blood pressure was "better". (*Id.* at 674-76.) He was advised to exercise regularly for weight loss and referred for an electromyography (EMG) test for his right hand numbness. (*Id.* at 676.) He also reported anxiety issues and going to Metrocare. (*Id.* at 674.)

On October 24, 2019, Plaintiff returned to Metrocare, complaining about anxiety, sadness,

forgetfulness, difficulty reading, and frustration "from not working", but he denied aggression or violent behavior. (*Id.* at 977.) He was advised to follow up with a primary care physician and neurologist for further assistance and an evaluation. (*Id.*)

On November 20, 2019, Plaintiff returned to Parkland, for bilateral hand pain/numbness and cramping, dropping things, and loss of grip strength. (*Id.* at 682.) He was alert and in no acute distress with normal bulk and tone. (*Id.*) An EMG revealed mild right carpal tunnel syndrome and moderate left carpal tunnel syndrome; there was no electrodiagnostic evidence of generalized polyneuropathy affecting the upper extremities or left cervical radiculopathy. (*Id.* at 683.)

On December 13, 2019, Plaintiff presented to Metrocare for a follow-up. (*Id.* at 981.) He reported that since taking Seroquel, he had "resolved hearing sounds", improved sleep, and reduced anxiety. (*Id.*) He was cooperative and appeared adequately groomed. (*Id.* at 982.) He had average mood, fair insight and judgment, normal attention and concentration, intact recent and remote memory, and normal gait and station. (*Id.*)

In a telephone call with Parkland on April 8, 2020, Plaintiff complained of hand pain that was not relieved with medication. (*Id.* at 687.) He was prescribed wrist braces and referred to the Parkland Hand Clinic. (*Id.* at 688.) His blood pressure medication was refilled, he was advised he could use diclofenac gel for pain up to four times a day, and his dosage of baclofen for cramps was increased to one or two pills as needed twice a day. (*Id.*) He was assessed with bilateral carpal tunnel syndrome, hypertension, mixed hyperlipidemia, muscle cramp, gastroesophageal reflux disease (GERD), and hyperglycemia. (*Id.*) In a telephone call with Parkland two days later, he reported that the inflammation medication was "somewhat helpful" and that he had raked leaves for 40 minutes before he needed a break. (*Id.* at 695.) He also reported that he had not purchased Duloxetine due to cost but was interested in doing so. (*Id.* at 696.)

11

On April 13, 2020, Plaintiff presented to Metrocare for a follow-up. (*Id.* at 985.) He reported increased anxiety while driving and in public places. (*Id.*) He was alert and oriented times four, and had logical thought content, intact memory, normal attention and concentration, and average mood. (*Id.* at 986.) He also had normal muscle strength, tone, gait, and station. (*Id.*)

## C.  May 15, 2020 Hearing

On May 15, 2020, Plaintiff and an impartial VE testified at a hearing before the ALJ. (*Id.* at 33-79.) Plaintiff was represented by an attorney. (*Id.* at 35.)

*1.  Plaintiff's Testimony*

Plaintiff testified that he had worked full-time as a floor installer at Best Floors Company Incorporated for 15 years until April 2018. (*Id.* at 41.) He could not sit while doing that job. (*Id.*) With another person, he lifted three- or four-hundred-pound rolls of vinyl, and he sometimes moved them on his own by using his belly. (*Id.* at 41-42.)[4]

Plaintiff weighed almost 300 pounds and was 5 feet and 7 inches. (*Id.* at 42.) He lived in a one-floor, single-family home with his father and adult youngest brother. (*Id.* at 42-43.) He received food stamps and had medical coverage through the "Parkland plan." (*Id.* at 43.) He had a driver's license but did not drive more than a mile away, or only to the store and the clinic, due to his anxiety. (*Id.* at 43-44.) He had a dog that was two to three feet tall. (*Id.* at 44.)

Plaintiff washed his laundry once a week and carried only small loads at a time due to muscle cramps in his arms. (*Id.* at 45-46.) Every two weeks, he went grocery shopping for about 20 minutes, and he had no problems with it. (*Id.* at 46.) He prepared his own meals and ate once a day. (*Id.*) He did house chores, including vacuuming, mopping, sweeping, and cleaning the

---

[4] During the hearing, Plaintiff's counsel stated that the severe impairments were anxiety, depression, osteoarthritis, and obesity. (doc. 19-1 at 42.)

bathrooms. (*Id.*) It took him "longer than a regular person" to do these chores because he had to "press … down to mop under the tables." (*Id.* at 47.) He took rest breaks "to get [his] energy back." (*Id.*) He took care of his hygiene needs without any help. (*Id.*) He could dress himself, although his brother sometimes helped him to put on his pants because he had inflammation in his hands and back in the morning, and he had trouble bending. (*Id.* at 48.)

Plaintiff took about 7 different kinds of medication. (*Id.*) On an average night, he slept between 6 and 7 hours, took medication to help him sleep, and did not take naps. (*Id.* at 49.)

During the day, Plaintiff did not watch television because the violence affected his anxiety, but he liked to read ghost stories and historical accounts, and he read about a book a week. (*Id.* at 49-50.) He did not spend time with other people and mostly kept to himself. (*Id.* at 50.) He did not have a phone, but he used a computer to communicate with two cousins via email. (*Id.*) Before the pandemic, he used to go to church. (*Id.* at 51.) If he were awarded benefits, he would handle the funds himself. (*Id.*)

For the prior six or seven years, Plaintiff had experienced knee problems; his right knee was worse than his left. (*Id.*) His knees popped, and he had pain "all the time", although sometimes it was "very little." (*Id.* at 52.) It varied from 4/10 to 10/10. (*Id.*) He had 10/10 pain twice a week, and it lasted about four hours. (*Id.* at 53.) At the time of the hearing, his knees had been "really bad", but it was mostly because of the change in weather. (*Id.*)

For about three years, Plaintiff had experienced pain and inflammation in his hands (including his fingers but not his thumbs), and his left hand was worse than his right. (*Id.* at 55-56.) His hand issues worsened over the years and "sn[uck] up on [him]" because he used his hands a lot at work. (*Id.*) He had spoken with his physician about it and been prescribed a muscle relaxer, which he took. (*Id.*) In November 2019, he had undergone testing that showed carpal tunnel

syndrome in both hands, with moderate carpal tunnel on his right hand. (*Id.* at 56.)

About seven or eight months earlier, Plaintiff had started to get muscle cramps in his lower back and forearms, causing them to "lock up" on him. (*Id.* at 57.) The muscle relaxer was also prescribed for the muscle cramps. (*Id.* at 57-58.) His muscle relaxer, 10 milligrams of Baclofen, was "too strong" and "knock[ed] [him] out" for the entire day sometimes; he had been taking it for three or four months. (*Id.* at 64.)

Plaintiff could kneel a couple of minutes, stand 8 minutes[5], walk about 100 yards before he needed a 15 or 20 minute break[6], and sit about 10 minutes before he needed a 5 minute break[7]. (*Id.* at 54, 58-59.) For the past two years, he could lift and carry about 10 pounds. (*Id.* at 60.) He could reach (but not lift anything) above his head. (*Id.* at 61.) He could open doors but not jars, type with one finger, and close zippers, but he had trouble with little buttons and shoelaces. (*Id.*) For two years, numbness in his fingers would come and go throughout the day "[p]retty much every day". (*Id.* at 62.) He had stopped working because of hand and knee pain; he "couldn't do [his] duties anymore". (*Id.* at 65.)

For the prior two years, Plaintiff had taken medication for anxiety and depression. (*Id.* at 62, 67-68.) For 15 minutes once a month, he visited a counselor/psychiatrist for a medication check-up; he had no medication side effects.[8] (*Id.* at 63, 67.) Plaintiff also experienced panic attacks. (*Id.* at 64-65.) Although his mental problems began when his mother passed away in February 2018, he worked until April 2018. (*Id.* at 65.) He was a supervisor, and he could not

---

[5] Plaintiff had been limited to standing for only 8 minutes "since May of 2018." (doc. 19-1 at 58.)

[6] He had been limited to walking 100 yards at a time for about five years. (doc. 19-1 at 59.)

[7] His cramps in his lower back limited his sitting for about three years. (doc. 19-1 at 59-60.)

[8] Plaintiff had stopped taking an unnamed medication that was recalled. (doc. 19-1 at 63-64.)

make "really good decisions anymore", but he was able to get along with people. (*Id.* at 65-66.) When he stopped working, he did not have problems with his memory and ability to understand, but at the beginning of 2020, it was "hard" for him to comprehend things, and he had trouble completing tasks and conversing, including stuttering. (*Id.* at 66-67.) He had mentioned these problems to his physician but was told to continue taking the same medication; he was not advised about individual or group therapy. (*Id.* at 67.)

After the ALJ examined the VE, Plaintiff testified as to his hypertension. (*Id.* at 75.) He had been prescribed two kinds of medication for four or five years, and the dosage had increased twice, but it controlled his hypertension "[v]ery little". (*Id.* at 75-77.) He experienced one or two "breathing attacks" a week, during which it was "hard" for him to breathe, and they limited him to walking no more than 100 yards at a time. (*Id.* at 75-76.) He was not receiving medication for his breathing problems but had been advised to not "exert" or "accelerate" himself. (*Id.* at 76.)

*2.  VE's Testimony*

The VE testified that Plaintiff had relevant past work as a floor layer (DOT 864.481 010, SVP-6)[9], which was heavy exertional activity as actually performed and medium exertional activity as generally performed. (*Id.* at 68-69.)

The VE first considered a hypothetical individual who could perform medium exertional activity (i.e., no lifting or carrying more than 50 pounds occasionally, 25 pounds frequently, and sit, stand, and walk up to an aggregate of 6 hours in an 8-hour workday) and unskilled work (i.e., work involving tasks that could be learned in 30 days or less), with no more than simple short instructions, simple work-related decisions, and few workplace changes, as well as occasional interaction with supervisors, occasional and incidental interaction with coworkers, and no

---

[9] DOT stands for Dictionary of Occupational Titles, and SVP stands for Specific Vocation Preparation.

interaction with the public, and with no requirement to meet defined production quotas, such as in production line work. (*Id.* at 69.) The VE opined that the hypothetical individual could not perform Plaintiff's past relevant work, but he could perform the jobs of a laundry worker (DOT 361.685-018, medium, SVP-2), with about 440,000 jobs nationally; industrial cleaner (DOT 381.687-018, medium, SVP-2), with about 1,300,000 jobs nationally; and general laborer (DOT 754.687 010, medium, SVP-2), with about 90,000 jobs nationally. (*Id.* at 69-70.)

The ALJ modified the hypothetical by limiting the individual to frequent handling and fingering bilaterally. (*Id.* at 70.) Per the VE, the individual could perform all three jobs. (*Id.*)

The ALJ again modified the hypothetical by limiting the individual to occasional balancing and climbing stairs and ramps, but not ladders, ropes, or scaffolds, and no crouching, crawling, kneeling. (*Id.*) The VE testified that the individual could still perform as a laundry worker and a general laborer, but not as an industrial cleaner. (*Id.*)[10]

The VE considered a second hypothetical individual who had the same limitations of unskilled work, social interactions, and production quota as the first, but who was limited to light exertional activity—i.e., lift and carry up to 20 pounds frequently and 10 pounds occasionally; sit, stand, and walk each up to 6 hours in an 8-hour workday—and could frequently handle and finger bilaterally, occasionally balance, climb ramps and stairs, but not stoop, crouch, crawl, kneel or climb ladders, ropes, and scaffolds. (*Id.* at 71-72.) There would be work available in the general economy for the second hypothetical individual as an inspector hand packager (DOT 559.687-074, light, SVP-2), with about 315,000 jobs nationally; plastic hospital products assembler (DOT 712.687-010, light, SVP-2), with about 197,000 jobs nationally; and electronics worker (DOT

---

[10] The VE initially stated that the individual could also work as a factory helper, but she corrected herself because the handling and fingering limitation was not consistent with the job duties. (doc. 19 at 71.)

726.687-010, light, SVP-2), with about 30,000 jobs nationally. (*Id.* at 72.)

The typical employer would tolerate one absence per month and 10 percent time off-task that was over and above the normal breaks; anything more would lead to termination. (*Id.* at 72-73.)

The VE confirmed the conformity of her testimony with the DOT, and that her testimony as to time off-task, absences, mental limitation, climbing ramps and stairs, and quota work was based on her knowledge, experience, and education as a vocational consultant. (*Id.*)[11]

**D. ALJ's Findings**

The ALJ issued his decision on June 24, 2020. (*Id.* at 27.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of April 1, 2018, through his date last insured of June 30, 2019. (*Id.* at 18.) At step two, he found that Plaintiff had the severe impairments of generalized anxiety disorder, social anxiety, and depressive disorder, as well as the non-severe impairments of obesity, carpal tunnel syndrome, umbilical hernia, and hypertension. (*Id.* at 18-19.) He also found that osteoarthritis and degenerative joint disease of the knees were not medically terminable impairments. (*Id.* at 20.) At step three, the ALJ concluded that Plaintiff's impairments did not singularly or in combination meet or medically equal the required criteria for any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (*Id.* at 20.) He expressly considered Listings 12.04 (depression, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders) in his findings. (*Id.*)

---

[11] The ALJ announced that upon a preliminary review of the medical records he did not find evidence of Plaintiff's hand, knee, or back problems. (doc. 19-1 at 74.) He advised Plaintiff's counsel that it "behooved" her to submit a "very brief summary" of the medical records with the page citations of any tests or clinical observations that would support any limitations. (*Id.*)

Next, the ALJ determined that Plaintiff retained the RFC to perform the full range of work at all exertional levels with the following nonexertional limitations: unskilled work, (i.e., tasks that could be learned in 30 days), involving no more than simple, short instructions and simple work-related decisions with few workplace changes, and work with occasional and incidental interaction with coworkers, occasional interactions with supervisors, and no interaction with the public. (*Id.* at 21.) At step four, he determined that Plaintiff was unable to perform his past work. (*Id.* at 25.) At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that he was not disabled regardless of whether he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id.* at 26.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from the alleged onset date of April 1, 2018, through the date last insured of June 30, 2019. (*Id.* at 27.)

## II.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding

of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992) (citing 42 U.S.C. § 423(d)(1)(A)).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

19

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.   ISSUES FOR REVIEW

Plaintiff presents three issues for review:

1.  The ALJ erred in not properly considering all of Plaintiff's severe [p]hysical impairments and the effects of those impairments, at Step 2.
2.  The ALJ's RFC is not based on substantial evidence.
3.  The ALJ erred by not ordering a consultative examination of Plaintiff's physical impairments.

(doc. 25 at 1.)

### A.   *Stone* Standard

"Plaintiff contends that the ALJ failed to apply the correct standard of 'severe' in making

the findings at step 2." (doc. 25 at 10.) The Commissioner responds that "the fact that the ALJ may not have cited the applicable legal standard, the *Stone* standard, or a similar case, at most, was harmless error, as substantial objective medical evidence demonstrates that the ALJ thoroughly considered [Plaintiff]'s credible impairments in the subsequent steps of the sequential evaluation process." (doc. 26 at 9.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii),(c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985). Accordingly, to meet the severity threshold at step two, "the claimant need only ... make a *de minimis* showing that [the] impairment is severe enough to interfere with her ability to do work." *Anthony*, 954 F.2d at 294 n.5 (citation omitted). "Because a determination [of] whether an impairment[ ] is severe requires an assessment of the functionally limiting effects of an impairment[ ], [all] symptom-related limitations and restrictions must be considered at this step." Social Security Ruling (SSR) 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). Ultimately, a severity determination may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

Here, when identifying Plaintiff's impairments, the ALJ did not mention or cite the severe

impairment standard set forth in Stone. (*See* doc. 19-1 at 16-27.) He did, however, cite SSR 85-28, which provides: "An impairment or combination of impairments is found 'not severe' … [at step two] when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered[.]" SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985); doc. 19-1 at 17-18. Recently, in *Keel v. Saul*, 986 F.3d 551, 556 (5th Cir. 2021), the Fifth Circuit expressly held that SSR 85-28 is consistent with and comports with the *Stone* standard despite the different wording, and "[r]emand is only appropriate 'where there is no indication that the ALJ applied the correct standard.'" *Id.* (comparing similar language used in *Stone* and SSR 85-28 and stating, "Though the precise wording differs, *Stone* and SSR 85-28 are not substantially different enough to warrant a finding of error" where the ALJ did not mention *Stone* but did cite to SSR 85-28).

To the extent that Plaintiff claims that the ALJ erred because he recited a severity standard that differed from *Stone*, remand is not required on this basis. *See Jeansonne v. Saul*, 855 F. App'x 193, 196 (5th Cir. 2021) (citing *Keel* and stating that "SSR 85-28 comports with Fifth Circuit case law and is an acceptable reference for the proper standard for step two").

## B. __Severe Impairments__

Plaintiff argues that the ALJ erred in not properly considering all of his "severe [p]hysical impairments", including obesity, bilateral carpal tunnel syndrome, umbilical hernia, hypertension, osteoarthritis, degenerative joint disease of the knees, "multiple joint" pain, GERD, myalgia, hyperlipidemia, hepatic stenosis, hepatomegaly, abnormal liver test, very high cholesterol, muscle cramps, and sigmoidectomy, and their effects, at step two. (doc. 25 at 8.) The Commissioner responds that "the ALJ properly evaluated [his] physical impairments." (doc. 26 at 7.)

*1. Obesity*

Plaintiff argues that the ALJ "discount[ed]" his obesity. (doc. 25 at 11.)

Obesity itself is not a listed impairment, but it can reduce an individual's occupational base for work activity in combination with other ailments. *See Beck v. Barnhart*, 205 F. App'x 207, 211 (5th Cir. 2006) (citing SSR 02-1p, 2002 WL 34686281, at *3, 6 (S.S.A. Sep. 12, 2002) ("Obesity can cause limitation[s] of [exertional and postural] function[s]", including the ability to sit, stand, walk, lift, carry, push, pull, climb, balance, stoop, crouch, manipulate, and "tolerate extreme heat, humidity, or hazards.")). "When evaluating the impact of obesity, the ALJ must consider it at all steps of the sequential evaluation process and perform 'an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.'" *Johnson v. Kijakazi*, No. 4:20-CV-04271, 2022 WL 3588042, at *6 (S.D. Tex. Aug. 22, 2022) (citing *Perkins v. Berryhill*, No. 4:18-CV-664-A, 2019 WL 2997082, at *2 (N.D. Tex. June 21, 2019), *report and recommendation adopted sub nom. Perkins v. Saul*, No. 4:18-CV-664-A, 2019 WL 2996055 at *2 (N.D. Tex. July 9, 2019) (citing SSR 02-1p), and citing SSR 19-2P, 2019 WL 2374244, at *2 (May 20, 2019) ("Obesity in combination with another impairment(s) may or may not increase the severity or functional limitations of the other impairment(s). We evaluate each case based on the information in the case record.")).

Here, the ALJ expressly "considered the potential impact of obesity in causing or contributing to co-existing impairments as required by [SSR] 19-2p" but found "no evidence of any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine, or cardiac functioning." (doc. 19-1 at 19.) He also noted that the Parkland treatment records "d[id] not indicate objective evidence of decreased mobility, difficulty breathing, shortness of breath on exertion, or any other evidence that his obesity affects his level of functioning"; Plaintiff instead

23

had displayed "normal range of motion, no edema, normal cardiovascular functioning, and no neurological abnormalities". (*Id.* (citing *id.* at 642); *see also id.* at 659, 667, 675, 710.) After making "an individualized assessment" of the impact of obesity on his functioning, the ALJ found that Plaintiff's obesity was a non-severe medically determinable impairment. (*Id.* at 19); *see Johnson*, 2022 WL 3588042, at *6.

Plaintiff points to the ALJ's citation to a Methodist record showing that he was 5 feet, 7 inches tall, and weighed 296 pounds, which "correlate[d]" to a BMI of 46. (doc. 25 at 11 (citing doc. 19-1 at 19, 709).) He also points to a Parkland record, which noted his reported arthritis, fatigue, and preference to work even if he "kn[ew] that he would not be hired for a job that would allow him to take multiple breaks." (*Id.* (citing doc. 19-1 at 640).)

Although Plaintiff's counsel mentioned his obesity during the hearing, she did not examine Plaintiff or the VE about any exertional limitations caused by it. (doc. 19-1 at 68, 73.) At no point in his initial application, upon reconsideration, or in his testimony did Plaintiff make any allegation about how his weight had affected his daily life such as his ability to walk, climb, lift, or sleep. (*See id.* at 41-68, 81-88, 91-99.) Aside from conclusory statements as to his inability to get a job because of his need for rest breaks and a mere reference to his weight, height, and BMI, he fails to cite to any evidence in the record showing that his obesity exacerbated his other medical impairments, or that his physicians opined that his obesity imposed additional functional limitations. *See Robertson v. Berryhill*, No. 2:16-CV-249, 2017 WL 6767373, at *6-7 (N.D. Tex. Dec. 11, 2017), *report and recommendation adopted sub nom. Robertson v. Berryhill*, No. 2:16-CV-249, 2018 WL 278674 (N.D. Tex. Jan. 2, 2018) (finding no error when the ALJ "did not mention or discuss plaintiff's BMI measurements or discuss plaintiff's qualifying obesity at any level of the sequential evaluation" because "there were no opinions from any medical sources

concluding plaintiff had any limitations specifically due to his weight or any evidence or testimony that his weight exacerbated his other impairments, and [no] evidence to show either that additional limitations were warranted due to plaintiff's weight").

Plaintiff has not shown that his obesity was a severe medical impairment. *See Anthony*, 954 F.2d at 294 n.5. The medical evidence instead shows substantial evidence to support the ALJ's finding that his obesity was not a medically determinable impairment that would interfere with his ability to perform work-related activities. *See Andrews v. Astrue*, 917 F. Supp. 2d 624, 639 (N.D. Tex. Jan. 9, 2013) (finding no error when the ALJ determined an impairment to be non-severe, even though the SAMC found moderate limitations due to the impairment, because there was a lack of examining medical evidence showing any effect on the plaintiff's ability to work); *see also McDaniel v. Colvin*, No. 4:13-CV-989-O, 2015 WL 1169919 at *5 (N.D. Tex. Mar. 13, 2015) (finding that the ALJ did not err in finding impairments to be non-severe because the ALJ considered the relevant evidence in his decision and the plaintiff did not point to evidence showing "any work-related limitations beyond those already found by the ALJ"). The ALJ did not err.

### 2. Carpal Tunnel Syndrome

Plaintiff points to his diagnosis of bilateral carpal tunnel syndrome. (doc. 25 at 10.)

In October 2019, Plaintiff complained of cramps and numbness in his right hand, although he exhibited no edema or tenderness, and he was prescribed Baclofen. (doc. 19-1 at 675-76.) A month later, he submitted to an EMG and was diagnosed with mild carpal tunnel syndrome in his right hand and moderate carpal tunnel syndrome in his right hand; he was advised to follow up with PCP. (*Id.* at 683-84.) Five months later, in April 2020, Plaintiff was prescribed bilateral wrist braces, his Baclofen dosage was increased, he was advised to take Diclofenac gel for pain up to 4 times a day, and he received a hand clinic referral. (*Id.* at 688.) Two days later, he reported that

25

the inflammation medication was "somewhat helpful" and that he had raked leaves for 40 minutes before he needed a break. (*Id.* at 695.) He also reported that he had not purchased Duloxetine due to cost but was interested in doing so. (*Id.* at 696.)

The ALJ specifically noted that Plaintiff reported hand pain in November 2019, and an EMG revealed mild right carpal tunnel syndrome and moderate left carpal tunnel syndrome. (*Id.* at 19 (citing *id.* at 683.)) He found that there had not been any significant treatment for carpal tunnel or surgical intervention and that despite complaints of inflammation in his hands, physical examinations showed no "significant decrease" in grip strength and instead showed 5/5 strength in his upper extremities. (*Id.* (citing *id.* at 682, 731.)) The ALJ also noted Plaintiff's testimony that he cooked, used a computer, did laundry, and could carry clothes in small loads. (*Id.* (citing *id.* at 45-46, 50.))[12] He concluded that Plaintiff's reported activities "reasonably suggest more ability to use his hands than alleged", and that his carpal tunnel syndrome was a non-severe medically determinable impairment. (*Id.* at 19); *see Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) ("The mere presence of some impairment is not disabling per se. Plaintiff must show that [he] was so functionally impaired by [his][disability] that [he] was precluded from engaging in any substantial gainful activity."); *Andrus v. Comm'r, Soc. Sec. Admin.*, No. 1:13-CV-01374, 2014 WL 3858446, at *3 (W.D. La. Aug. 5, 2014) (finding that the medical evidence did not support a finding that plaintiff's carpal tunnel syndrome was severe). The ALJ did not err.

### 3. Hypertension

Plaintiff appears to argue that the ALJ should have found his hypertension to be a severe impairment. (doc. 25 at 14.)

---

[12] Plaintiff also testified that he vacuumed, mopped, swept, and cleaned the bathrooms, although it took him longer because he had to take breaks to rest. (*Id.* at 46-47.)

Plaintiff was first diagnosed with hypertension in December 2011, and it continued through at least April 2020. (doc. 19-1 at 304, 317, 336, 351, 371, 383, 394, 402, 457, 462, 477, 515, 564, 619, 629, 638, 642, 649, 654-55, 659, 661, 668, 676, 688.) In 2016, he was prescribed anti-hypertensive medication, he was medication-compliant, his dosage was increased twice, and his hypertension was "stable and controlled". (*Id.* at 77, 273, 276, 278, 288, 313, 335-36.)

The ALJ specifically found that the record did not support any significant functional limitations because of Plaintiff's high blood pressure. (*Id.* at 19.) He specifically noted that although Plaintiff presented with elevated blood pressure on examination, his cardiovascular examinations had been normal. (*Id.* (comparing *id.* at 622, with 723, 750. 809.)) The ALJ also noted that there were no medical opinions in the record that "consistently" indicated that Plaintiff's hypertension caused him "any significant functional impairment", and he concluded that it was a medically determinable impairment that was non-severe. (*Id.* at 19); *see Williams v. Berryhill*, No. CV H-17-609, 2018 WL 2335356, at *5 (S.D. Tex. Feb. 28, 2018) (agreeing with the ALJ that plaintiff's hypertension was non-severe because it had been "treated with medication"). The ALJ did not err.

4. *Umbilical Hernia*

Plaintiff contends that his hernias were a severe impairment. (doc. 25 at 10.) He points to an October 2017 CT scan of his abdomen that revealed "multiple abdominal wall fat contain[i]ng hernias." (*Id.*)

In October 2017, Plaintiff went to Methodist ER for abdominal pain. (doc. 19-1 at 498, 859.) He had tenderness in the lower right quadrant but normal bowel sounds, exhibited no distension, and denied pain in the lower extremities or back. (*Id.* at 498, 500.) A CT scan of the abdomen revealed a normal appendix and multiple anterior abdominal wall fat-containing hernias

but there was no evidence of strangulation or obstruction. (*Id.* at 502.) He was administered an iohexol injection, and his pain "improved." (*Id.*) He was given a surgery referral and discharged in stable condition hours later. (*Id.* at 503.) In March 2019, Plaintiff returned to Methodist ER complaining of sharp and constant pain in his right lower back; he denied gastrointestinal pain. (*Id.* at 708-09.) He was given a ketorolac injection, diagnosed with back strain, and discharged the same day. (*Id.* at 711-12.) In October 2019, two years after his CT scan, Plaintiff presented to Parkland complaining of joint pain, cramps, and numbness. (*Id.* at 674, 676.) His abdominal system was normal, and he denied any gastrointestinal pain. (*Id.* at 675.)

The ALJ specifically considered the October 2017 scan, but he noted that it occurred "*[p]rior to*" Plaintiff's alleged onset date, there was no evidence of strangulation or bowel obstruction, and he denied any gastrointestinal pain during the relevant period. (*Id.* at 19 (citing *id.* at 502, 675, 709)); *see Hyder v. Astrue*, No. 11-CV-00641, 2012 WL 9391859, at *7 (S.D. Tex. Apr. 10, 2012) ("The record does not contain objective evidence of any complications or complaints with regard to those diagnoses [of hiatal hernia and GERD], which would suggest that these impairments specifically qualified as severe."). Notably, the ALJ found that the medical record lacked evidence of any "significant treatment" for his hernia, and he concluded that it was non-severe. (doc. 19-1 at 19); *see Powell v. Sec'y of Health & Hum. Servs.*, No. 1:12-CV-00265-SAA, 2013 WL 4590351, at *6 (N.D. Miss. Aug. 28, 2013) (finding the ALJ properly found that plaintiff's medical conditions, including post hernia repair, were non-severe as they "imposed no more than a minimal impact on the claimant's ability to perform work-related activity") (citing *Stone*, 752 F.2d 1099); *see also Hyder*, 2012 WL 9391859, at *7 (finding that the ALJ "properly found that [plaintiff] had the medically determinable impairments of GERD and hiatal hernia, but that neither qualifies as severe"). The ALJ did not err.

5.  *Other Conditions*

Plaintiff contends that "the records in this case show that [he] suffers from severe physical impairments." (doc. 25 at 10.) He contends:

> Treating doctors assessed that [Plaintiff] suffered from … mixed hyperlipidemia[13], myalgia[14], multiple joint pain, arthral[gia][15]. … His diagnosed conditions included … muscle cramp[s], GERD. He had an abnormal liver test and very high cholesterol. The treatment notes state that [he] had had nine ER visits within the 45 days prior to his Sept. 21, 2018 ER visit at Methodist. An Oct. 2017 CT of his abdomen showed … post[-]surgical changes of sigmoid colon, hepatic ste[atosis][16] and hepatomegaly[17]. A stent was placed in his sigmoid colon during the July 26, 2016, sigmoidectomy[18].

(*Id.* at 10-11) (internal citations to the record omitted).

The ALJ did not address or mention Plaintiff's arthralgia, "multiple joint pain", myalgia, muscle cramps, GERD, hyperlipidemia, hepatic steatosis, hepatomegaly, "abnormal liver test", "very high cholesterol", or sigmoidectomy (including any related stent and post-surgical changes of sigmoid colon). (*See* doc. 19-1 at 16-27.) He considered Plaintiff's physical examinations, which showed normal strength and range of motion, and imaging findings of his back that were "largely normal". (*Id.* at 22 (citing *id.* at 659, 731.)) He also found that the SAMCs' opinions, which were based upon their expertise and comprehensive records review, that Plaintiff did not have a severe physical impairment were generally consistent with the evidence of record and contained multiple citations to the objective medical evidence and his reported activities. (*Id.* at 24

---

[13] Hyperlipidemia refers to "elevated levels of lipids in the blood plasma." *Hyperlipidemia*, Stedmans Medical Dictionary (2014).

[14] Myalgia is "muscular pain." *Myalgia*, Stedmans Medical Dictionary (2014).

[15] Arthralgia is "pain in a joint." *Arthralgia*, Stedmans Medical Dictionary (2014).

[16] Hepatic steatosis is also known as fatty liver. *Hepatic steatosis*, Stedmans Medical Dictionary (2014).

[17] Hepatomegaly is "[e]nlargement of the liver." *Hepatomegaly*, Stedmans Medical Dictionary (2014).

[18] Sigmoidectomy is the "[e]xcision of the sigmoid colon." *Sigmoidectomy*, Stedmans Medical Dictionary (2014).

(citing *id.* at 81-88, 91-99.)) The ALJ also considered Plaintiff's testimony that he could use the computer, shop, and cook. (*Id.* at 19 (citing *id.* at 45-46, 50.)) Because the ALJ considered all of the medical and non-medical evidence, including imaging, treatment notes, Plaintiff's activities of daily living, and the SAMCs' opinions, his determination that these conditions were not severe impairments is supported by substantial evidence, even if he did not mention or address them. (doc. 19-1 at 267-995); *see Richardson v. Saul*, No. 3:21-CV-0676-D-BH, 2022 WL 3337772, at *9 (N.D. Tex. June 16, 2022) (finding substantial evidence supported the ALJ's decision even if it did not address plaintiff's degenerative disc disease and tricompartmental degenerative changes), *report and recommendation adopted sub nom. Richardson v. Comm'r of Soc. Sec. Admin.*, No. 3:21-CV-0676-D, 2022 WL 2527044 (N.D. Tex. July 7, 2022).

Despite referencing numerous medical records and diagnoses and making conclusory statements, Plaintiff does not show that any medical source identified the following conditions of arthralgia, "multiple joint pain", myalgia, muscle cramps, GERD, hyperlipidemia, hepatic steatosis, hepatomegaly, "abnormal liver test", "very high cholesterol", or sigmoidectomy, as a severe impairment. (doc. 25 at 10-11; doc. 19-1 at 20, 267-990); *see Danzy v. Comm'r of Soc. Sec.*, No. SA-21-CV-00350-XR, 2022 WL 2063730, at *5 (W.D. Tex. June 8, 2022) ("Ultimately, [plaintiff] has the burden to prove her disability by establishing physical or mental impairment.") (citation omitted). Substantial evidence instead supports the ALJ's finding that these conditions did not interfere with his ability to perform work-related activities. *See Hammond v. Barnhart*, 124 F. App'x 847, 853 (5th Cir. 2005) (holding that, even though there was "some evidence that point[ed] to a conclusion that differ[ed] from that adopted by the ALJ," there was no error because there was "far more than a scintilla of evidence in the record that could justify [the] finding that [the plaintiff's] impairments were not severe disabilities"); *see also Leggett*, 67 F.3d at 564

(holding that a reviewing court must defer to the ALJ's decision when substantial evidence supports it). The ALJ did not err.[19]

### 6. Harmless Error

Plaintiff also contends that "[b]ecause it is conceivable that the ALJ could have reached a different disability determination, the error at step two is not harmless and requires remand." (doc. 25 at 12.)

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that consideration of the Parkland records might have led to a different decision. *See id.* at 816 (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)).

Even if the ALJ erred by finding Plaintiff's obesity, bilateral carpal tunnel syndrome, umbilical hernia, and hypertension as non-severe, by not finding osteoarthritis and degenerative joint disease of the knees as medically determinable impairments, and by not addressing or mentioning "multiple joint" pain, GERD, myalgia, hyperlipidemia, hepatic stenosis,

---

[19] Plaintiff also points to the "nine ER visits within the 45 days prior to his Sept. 21, 2018 ER visit at Methodist" as evidence of his severe impairments. (doc. 25 at 10 (citing doc. 19-1 at 617).) He does not identify any medical condition and provides merely one citation to the record, i.e., the September 2018 treatment note. (*Id.* at 617.) This is insufficient to meet his burden to show he has a severe impairment. *See Murray v. Kijakazi*, No. 4:20-CV-1707, 2022 WL 824844, at *4 (S.D. Tex. Mar. 18, 2022) (finding that plaintiff's conclusory and "single sentence" about his impairments failed to carry his burden to show that they were severe) (citation omitted).

hepatomegaly, abnormal liver test, very high cholesterol, muscle cramps, and sigmoidectomy at step two, the error was harmless because he found that Plaintiff's impairments, considered singly and in combination, did not significantly limit his ability to perform basic work activities. (doc. 19-1 at 20.) The ALJ noted that there was "no evidence of any specific or quantifiable impact" of Plaintiff's obesity on his pulmonary, musculoskeletal, endocrine, or cardiac functioning. (*Id.* at 19.) He also noted the lack of significant treatment or surgical intervention for Plaintiff's carpal tunnel and hernia. (*Id.*) He also noted that no medical opinions in the record "consistently" indicated that Plaintiff's hypertension caused him "any significant functional impairment". (*Id.*) Although the ALJ did not mention or address the conditions of arthralgia, "multiple joint pain", myalgia, muscle cramps, GERD, hyperlipidemia, hepatic steatosis, hepatomegaly, "abnormal liver test", "very high cholesterol", or sigmoidectomy, Plaintiff does not show that any medical source identified them as a severe impairment. (*See* doc. 25.) He has not shown that consideration of the medical evidence record might have led to a different decision. *See Keel*, 986 F.3d at 556 ("Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached even if the ALJ did not err.") (citing *Frank*, 326 F.3d at 622). Remand is not required on this issue.[20]

## C.  **RFC Assessment**

Plaintiff argues that the ALJ's RFC is not based on substantial evidence. (doc. 25 at 12.) The Commissioner responds that the ALJ properly assessed Plaintiff's RFC. (doc. 26 at 12.)

Residual functional capacity, or RFC, is defined as the most that a person can still do

---

[20] Plaintiff also asserts that "[m]uch" of the medical evidence regarding his physical impairments predates his alleged onset date of April 1, 2018, that it is "still relevant", and that the ALJ "must" review it. (doc. 25 at 11.) To the extent he argues that the ALJ did not review records relating to his hypertension diagnosis in 2011 or those relating to his sigmoidectomy and umbilical hernia in 2016, substantial evidence supports the ALJ's decision, and the court will not reweigh the evidence. *See Leggett*, 67 F.3d at 564 (holding that a reviewing court must defer to the ALJ's decision when substantial evidence supports it); *Greenspan*, 38 F.3d at 236.

despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. at § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence

33

supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations: unskilled work, i.e., tasks that can be learned in 30 days involving no more than simple, short instructions and simple work-related decisions with few workplace changes, and work with occasional and incidental interaction with coworkers, occasional interactions with supervisors, and no interaction with the public. (doc. 19-1 at 21.)

### 1. Physical RFC

Plaintiff contends that the ALJ relied on flawed VE testimony. (*See* doc. 25 at 13.)

#### a. Consideration of Impairments

Plaintiff first argues that the ALJ's RFC determination that he had no exertional limitations "ignores evidence of [his] physical impairments", but he does not specify which exertional limitations the ALJ failed to consider. (doc. 25 at 13.)

After making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the physical RFC to perform a full range of work at all exertional levels. (doc. 19-1 at 21.) In reaching his determination, the ALJ specifically considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence", based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p, 1996 WL 374181,

at *2 (S.S.A. July 2, 1996). (*Id.*) He also considered the prior administrative medical findings in accordance with the requirements of 20 C.F.R. § 404.1520c and found that the SAMCs' opinions were "persuasive" because they were generally consistent with the evidence of record and were supported by "multiple citations" to the objective medical evidence and Plaintiff's activities of daily living. (*Id.* at 24; *see id.* at 81-88, 91-99.)) The ALJ found that Plaintiff's testimony regarding his exertional limitations was "not consistent" with the objective examination findings or objective imaging. (*Id.* at 22.) He noted, for instance, that despite Plaintiff's hospital visits for complaints of right low back pain or left arm swelling/redness, he had "largely normal" imaging of his back, and his physical examination findings showed normal range of motion, neurovascularly intact distally, and 5/5 strength in all extremities. (*Id.* at 22 (citing *id.* at 659, 705, 731.)) He also noted that there was no evidence of ongoing treatment to support his allegations of back, hand, and knee pain. (*Id.* at 22.)

Because the ALJ considered the medical and non-medical evidence of record, the SAMCs' assessments, and Plaintiff's allegations, the ALJ's decision reflects that he properly weighed all the evidence in making his physical RFC determination and it was supported by substantial evidence. *See Boyd v. Colvin*, No. 3:14-CV-3621-B-BH, 2016 WL 11431548, at *19 (N.D. Tex. Mar. 28, 2016), *report and recommendation adopted*, No. 3:14-CV-3621-B, 2016 WL 1578767 (N.D. Tex. Apr. 19, 2016) (finding the ALJ's decision was supported by substantial evidence where he "took into account" the treatment notes, the assessments by the non-examining and non-treating doctors, and Plaintiff's testimony). He also considered the factors for determining credibility and adequately explained his reasons for rejecting Plaintiff's subjective complaints. *See id.* The ALJ properly resolved any conflict between Plaintiff's subjective complaints and the medical evidence of record. *See Strothers v. Kijakazi*, No. 3:21-CV-00129, 2022 WL 2193300, at

*3 (S.D. Tex. June 17, 2022) (finding that the ALJ properly resolved the conflict between medical records that noted both plaintiff's "mobility issues regarding his right shoulder" followed by "generally normal physical examinations" "a short time later" that included normal coordination, full strength in all extremities, and normal sensation). Plaintiff has not shown that the ALJ erred in his consideration of the physical evidence.

### b.  Hypothetical Question

Plaintiff also argues that the RFC, which placed "no exertional limitation" on him, is "inconsistent" with ALJ's hypotheticals regarding individuals limited to medium or light exertional jobs. (doc. 25 at 14.)

To establish that work exists for a claimant at step five of the sequential disability determination process, the ALJ relies on the testimony of a VE in response to a hypothetical question[21] or other similar evidence, or on the Medical-Vocational Guidelines promulgated to guide this determination, often referred to as "the Grids." *Newton*, 209 F.3d at 458; *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); 20 C.F.R. Pt. 404, Subpt. P, App. 2. A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *See Bowling*, 36 F.3d at 436; *see also Hernandez v. Astrue*, 269 F. App'x 511, 515 (5th Cir. 2008) (citing *Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002)). A claimant's failure to point out deficiencies in a hypothetical question does not, however, "automatically salvage that hypothetical as a proper basis for a determination of non-

---

[21] "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)).

disability." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). The ALJ's failure to reasonably incorporate a claimant's disability into his or her hypothetical questions may render those questions defective if the disability severely limits the claimant's job prospects. *See Bridges v. Comm'r of Soc. Sec. Admin.*, 278 F.Supp.2d 797, 806-07 (N.D. Tex. July 29, 2003). If, in making a disability determination, the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden of proof to show that a claimant could perform available work despite an impairment. *Boyd*, 239 F.3d at 708.

Here, the ALJ first presented to the VE a hypothetical individual with the same age, education, and past relevant work experience as Plaintiff, who had the following RFC:

> [L]imited to medium exertional activity, [i.e.,] no lifting or carrying more than 50 pounds occasionally, 25 pounds frequently[,] [c]apable of sitting, standing, and walking each up to an aggregate of six hours in an eight-hour day[;] [c]apable of performing unskilled work, [i.e.], work involving tasks that can be learned in 30 days or less, with no more than simple short instructions, simple work related decisions, and few workplace changes[;] capable of work that involves no more than occasional interaction with supervisors, occasional and incidental interaction with coworkers, and no interaction with the public[;] [a]nd … capable of work involving no requirement to meet defined production quotas, such as in production line work.

(doc. 19-1 at 69.) The VE opined that the hypothetical individual could not perform Plaintiff's past relevant work, which was heavy exertional activity as actually performed and medium exertional activity as generally performed. (*Id.* at 68-69.) Such an individual could perform the jobs of a laundry worker, industrial cleaner, and general laborer—all of which were medium exertional jobs with an SVP of 2, however. (*Id.* at 69-70.) The VE considered a second hypothetical individual who had the same limitations as to unskilled work, social interactions, and production quota, but who was limited to light exertional activity—i.e., lift and carry up to 20 pounds frequently and 10 pounds occasionally; sit, stand, and walk each up to 6 hours in an 8-hour workday—and could frequently handle and finger bilaterally, occasionally balance, climb ramps and stairs, but not

stoop, crouch, crawl, kneel or climb ladders, ropes, and scaffolds. (*Id.* at 71-72.) The VE opined that there would be work available in the general economy for the second hypothetical individual as an inspector hand packager, plastic hospital products assembler, and electronics worker—all of which were light exertional jobs with an SVP of 2. (*Id.* at 72.) The VE also testified about the availability of the jobs, the conformity of her testimony with the DOT, and that her testimony as to time off-task, absences, mental limitation, climbing ramps and stairs, and quota work was based on her knowledge, experience, and education as a vocational consultant. (*Id.* at 69-73.) The ALJ concluded that Plaintiff was capable of performing other work that existed in significant numbers in the national economy, and that under this framework of rules, a finding of "not disabled" was appropriate for Plaintiff. (*Id.* at 26.)

Plaintiff contends that the ALJ's physical RFC with no exertional limitations was "inconsistent" with the hypothetical questions regarding individuals limited to medium or light exertional jobs. (doc. 25 at 14.) As noted, substantial evidence supports the ALJ's finding that Plaintiff had the physical RFC to perform a full range of work with no exertional limitations. Such an individual "should be able to perform at all exertional levels", including medium and light exertional jobs. *See Dixon v. Comm'r, SSA*, No. 4:18-CV-634, 2019 WL 5875901, at *1 (E.D. Tex. Sept. 27, 2019) (citing 20 C.F.R. § 404.1567) ("If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work."). Because substantial evidence supports the ALJ's finding that Plaintiff had the physical RFC to perform a full range of work with no exertional limitations, Plaintiff has not shown that it is inconsistent with the hypotheticals posed to the VE regarding individuals limited to medium or light exertional jobs. *See id.*; *see also Morris*, 864 F.2d at 336 (finding that the ALJ's hypothetical question to the VE "reasonably incorporated" the limitations supported by the evidence of record). Remand is not

required on this issue.

### 2. *Mental RFC*

Plaintiff argues that "no medical opinion evidence supports the mental portion of the RFC." (doc. 25 at 13.) He also argues that neither SAPC provided a mental RFC. (*Id.*)

#### a. *Ripley* Error

In *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. *See* 67 F.3d at 552. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work, so the ALJ's RFC determination was not supported by substantial evidence. *Id.* The Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557-58. Notably, it rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27; *see also Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112, at \*7 (E.D. Tex. Feb. 27, 2003).

Here, the ALJ does not identify the medical opinions that are the source of the mental limitations he determined for Plaintiff. He considered Plaintiff's medical records and found that

they indicate "ongoing treatment related to mental health issues", the most significant of which were anxiety, depression, and social anxiety. (doc. 19-1 at 23.) He specifically referenced Plaintiff's Parkland and Metrocare treatment records from July 2018 to April 2020 and noted Plaintiff's "ongoing" treatment related to his mental health issues, the "most significant" of which were depression, anxiety, and social anxiety. (*Id.*) The ALJ considered that Plaintiff reported or was observed as displaying behaviors and temperament "consistent" with these conditions, including anxiety, chest pains, stress, panic, anxiety when driving, difficulty being in public, spontaneous speech, and having a labile affect. (*Id.* (citing *id.* at 597, 971, 977, 985-86.)) He also referenced Plaintiff's July 2018 ER visit for "symptoms of anxiety" and his diagnoses of anxiety and stress. (*Id.* (citing *id.* at 564, 570.)) He also noted that Plaintiff presented as anxious or in mild distress but had otherwise normal mental status examinations, including normal mood, affect, memory, attention, and concentration, and he presented adequately groomed, in December 2018, August 2019, December 2019, and April 2020. (*Id.* (citing *id.* at 640-42, 971, 982, 986.)) The ALJ further considered Plaintiff's statements that his symptoms were "not as bad as they used to be" in December 2018 and that his anxiety was reduced by medication in December 2019. (*Id.* (citing *id.* at 640, 981.)) None of that medical evidence addressed the effects of Plaintiff's conditions on his ability to work, however. *See Browning*, 2003 WL 1831112, at *7 (finding despite the fact that there was a vast amount of treating sources' medical evidence in the record establishing that plaintiff suffered from certain impairments, including voluminous progress reports, clinical notes, and lab reports, "none [made] any explicit or implied reference to effects these conditions h[ad] on claimant's ability to work" and the ALJ could not rely on that "raw medical evidence as substantial support for" the claimant's RFC); *see also Turner v. Colvin*, No. 3:13-CV-1458-B, 2014 WL 4555657, at *5 (N.D. Tex. Sept. 12, 2014) ("[E]vidence which merely describes

Plaintiff's medical conditions is insufficient to support the ALJ's RFC determination.") (citation omitted).

Additionally, the SAPCs found there was insufficient evidence to evaluate Plaintiff's mental impairments for the relevant disability period and did not offer an opinion on his functional abilities. (doc. 19-1 at 81-88, 91-99.) The ALJ found their opinions unpersuasive because they were over a year old, were not based on an in-person examination, and did not reflect the "substantial additional medical evidence" received at the administrative hearing level. (*Id.* at 24-25.) While the ALJ may choose to reject the opinions of the SAPCs, "he cannot independently decide the effects of Plaintiff's ... impairments on his ability to work, as that is expressly prohibited by *Ripley*." *Shugart v. Astrue*, No. 3:12-CV-1705-BK, 2013 WL 991252, at *5 (N.D. Tex. Mar. 13, 2013) (finding the ALJ erred by rejecting the only doctor's opinion regarding plaintiff's limitations from mental impairments and independently decided that plaintiff could perform simple, unskilled work).

The ALJ did consider Examiner's January 2019 psychological consultative examination and its findings that Plaintiff had intact memory, could concentrate, displayed fair judgment, and could manage funds if awarded. (doc. 19-1 at 20, 25 (citing *id.* at 631-35.)) He noted that Plaintiff's abilities were "tested", and Examiner found he could do simple abstract reasoning tasks, had fair insight, average fund of knowledge, and appeared anxious but was polite, cooperative, and respectful. (*Id.* at 20-21, 25 (citing *id.* at 631-34.)) He found it "persuasive" because it was "consistent with the objective examination findings" and was supported by Examiner's examination and "firsthand" observation of Plaintiff. (*Id.* at 25 (citing *id.* at 631-34.)) Even the ALJ noted that Examiner's opinion lacked a function-by-function analysis of Plaintiff's abilities, however, and he found that it merely provided "insight" in determining Plaintiff's RFC. (*Id.* at

25); *see Ripley*, 67 F.3d at 552 (finding that a record containing "a vast amount of medical evidence" establishing that the claimant had an impairment did not "*clearly*" establish the effect of that impairment on his ability to work) (emphasis added); *see also Connie C. v. Berryhill*, No. 5:18-CV-169-BQ, 2019 WL 2516727, at *7 (N.D. Tex. May 30, 2019) (concluding that there were no medical opinions to support the ALJ's decision because various consultative examinations "outlined some of Plaintiff's mental problems" but did not include a statement on the effects of her generalized anxiety disorder, major depressive disorder, and somatic symptom disorder on her ability to work), *report and recommendation adopted*, No. 5:18-CV-0169-C-BQ, 2019 WL 2515188 (N.D. Tex. June 18, 2019).

There are no medical opinions in the record regarding the effects Plaintiff's mental impairments had on his ability to work, particularly in the areas of understanding, remembering, carrying out instructions, persisting and maintaining pace, and adapting and managing oneself, so the ALJ appears to have relied on his own interpretation of the medical and other evidence, which he may not do. *See Salmond v. Berryhill*, 892 F.3d 812, 818 (5th Cir. 2018) (stating that "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability") (citation omitted); *Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ("An ALJ may not—without the opinions from medical experts—derive the applicant's [RFC] based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *see also Tyler v. Colvin*, No. 3:15-CV-3917-D, 2016 WL 7386207 (N.D. Tex. Dec. 20, 2016) (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination); *Davis v. Astrue*, No. 1:11-CV-00267-SA-JMV, 2012 WL 6757440 (N.D. Miss. Nov. 6, 2012) ("In formulating a claimant's RFC, the

ALJ—a layperson—may not substitute his own judgment for that of a physician."), *adopted by* 2013 WL 28068 (N.D. Miss. Jan. 2, 2013). Consequently, substantial evidence does not support the mental aspect of the ALJ's RFC determination. *See Geason v. Colvin*, No. 3:14-CV-1353-N, 2015 WL 5013877, at *5 (N.D. Tex. July 20, 2015) ("Because the ALJ erred in making an RFC determination without medical evidence addressing the effect of Plaintiff's impairment on her ability to work, the ALJ's decision is not supported by substantial evidence."); *Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014) (finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination).

### b. Harmless Error

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show he was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing his RFC. *See Mays*, 837 F.2d at 1364 (per curiam). To establish prejudice, Plaintiff must show that the ALJ's failure to rely on a medical opinion as to the effects his impairments had on his ability to work casts doubt onto the existence of substantial evidence supporting his disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris*, 864 F.2d at 335).

The ALJ's failure to rely on a medical opinion in determining Plaintiff's RFC casts doubt as to whether substantial evidence exists to support the finding that he is not disabled. *See Connie*

*C.*, 2019 WL 2516727, at *7 (finding that the ALJ "erred in making a mental RFC determination without medical opinion evidence in the record addressing the impact of Plaintiff's mental impairments on her ability to work, and substantial evidence does not support the RFC determination"); *see also Thornhill v. Colvin*, No. 14-CV-335-M, 2015 WL 232844, at *11 (N.D. Tex. Dec. 15, 2014) (finding prejudice "where the ALJ could have obtained evidence that might have changed the result—specifically, a medical source statement"), *adopted by* 2015 WL 232844 (N.D. Tex. Jan. 16, 2015). The error is not harmless, and remand is required on this issue.[22]

## IV.   CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** for reconsideration.

**SO ORDERED** on this 29th day of September, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[22] Because the ALJ's determination of Plaintiff's mental RFC on remand will likely affect the remaining issue, it is not addressed.